IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARIA ROSE FINAZZO, | ) | CIVIL NO.  05-00524 JMS/LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING |
| | ) | DEFENDANT'S MOTIONS FOR |
| HAWAIIAN AIRLINES, | ) | PARTIAL SUMMARY JUDGMENT |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |

## ORDER GRANTING DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Maria Rose Finazzo ("Plaintiff") alleges that Defendant

Hawaiian Airlines, Inc. ("Hawaiian") unlawfully discriminated against her because

she was female; that she was sexually harassed and subjected to a hostile work

environment; and that Hawaiian illegally retaliated against her, all in violation of

Title VII and Hawaii Revised Statutes ("HRS") § 378-2.[1]  Plaintiff also claims that

Hawaiian is liable for intentional infliction of emotional distress and punitive

---

[1] Plaintiff's Second Amended Complaint states, "[t]his action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination and 42 Section 1981 and 1983 for civil rights violations."  Second Am. Compl. ¶ 4.  However, Plaintiff only alleges claims under Title VII (Count I); HRS § 378-2 (Count II); and intentional infliction of emotional distress (Count III).  Plaintiff's Second Amended Complaint does not include § 1981 or § 1983 claims and they are not addressed here.

damages.  Hawaiian has filed two motions for partial summary judgment, arguing

that certain claims should be dismissed because Plaintiff failed to exhaust her

administrative remedies; that other claims are time-barred; that Plaintiff has failed

to offer sufficient evidence of discrimination, harassment, or retaliation; that

Plaintiff's claim for intentional infliction of emotional distress was previously

dismissed as a Rule 37 sanction; and that Plaintiff has not offered evidence

sufficient to sustain a claim for punitive damages.  The court agrees and GRANTS

Defendant's Motion for Partial Summary Judgment on Count I (Title VII) and

Count II (HRS § 378-2) and also GRANTS Defendant's Motion for Partial

Summary Judgment on Count III (Intentional Infliction of Emotional Distress) and

Punitive Damages.

## II. <u>BACKGROUND</u>

### A.    Factual Background

Plaintiff is a commercial airline flight pilot with the rank of captain.[2]

---

[2]  This Order contains a number of acronyms.  Although they are explained in this Order, they are collected here for ease of reference:

*ALPA*:  The Airlines Pilot's Association, International, the largest airline pilot union in the world representing pilots in the United States and Canada;
*ASAP*:  The Federal Aviation Agency's Aviation Safety and Partnership Program;
*CRM*:  A Crew Resource Management training course offered by Hawaiian;
*ERC*:  The ASAP Event Review Committee designated to review confidential ASAP reports;
*FAA*:  The Federal Aviation Administration;

(continued...)

Plaintiff estimates that of the 437 pilots on Hawaiian's seniority list, less than ten percent are women.  Def's. Ex. I at 3.  Plaintiff was hired by Hawaiian on April 22, 1986, and has flown DC-10s, 747s, and 767s.  From 2003 to 2005, the time period covered by the present suit, Plaintiff was not suspended, demoted, transferred, or terminated.  *See* Pl's. Dep. Tr. attached as Def's. Ex. F at 362-63, 369.  During this time, Plaintiff's average monthly flight bid was the bare minimum of 75 hours a month; on average, Plaintiff has worked no more than 19 hours a week during the past three years.  O'Handley Decl. ¶¶ 2, 12; Def's. Ex. D.

In March of 2003, Plaintiff submitted a bid to fly the 767, the most technologically advanced aircraft in Hawaiian's fleet.  Plaintiff flew a 767 for the first time on April 5, 2003.  During her next seventy hours as a pilot-in-command of a 767, Plaintiff was accompanied by nine different first officers.  Three of those nine first officers -- all of whom had more flight experience in a 767 than Plaintiff -- filed privileged, external safety reports with the Federal Aviation Administration's ("FAA") Aviation Safety and Partnership Program ("ASAP")

---

[2](...continued)
*House Rules*:  Hawaiian's internal set of rules prohibiting discrimination and harassment;
*LOE*:  Line Oriented Evaluation, a component of flight training;
*LOFT*:  Line Oriented Flight Training Program administered by Hawaiian;
*MOU*:  Memorandum of Understanding between Hawaiian and ALPA extending the ASAP program to Hawaiian and establishing the ERC; and
*Policy*:  Hawaiian's Discrimination and Harassment-Free Workplace Policy.

Event Review Committee ("ERC") [3] and Hawaiian, citing concerns regarding Plaintiff's ability to safely land the 767.  *See* Blankenship Decl. ¶¶ 7, 8.  For her part, Plaintiff claims that two of these three first officers either sexually harassed her or discriminated against her on account of her gender and that Hawaiian's response to these incidents was inadequate and constituted unlawful retaliation. *See* Pl's. Decl. ¶¶ 5, 12, 19.

###   1.   *April 27 and 28, 2003 Flight With Vance Tilley*

First Officer Vance Tilley ("Tilley") was Plaintiff's second-in-command on flights from Honolulu to Ontario and Ontario to Las Vegas on April 27 and 28, 2003.  Tilley and Plaintiff had not met before their April 27, 2003 flight.  Tilley Decl. ¶¶ 2, 3.  Although Tilley was Plaintiff's subordinate, and as a first officer was subject to a lower proficiency standard than a captain, he had over

---

[3]  As explained by Hawaiian Fleet Captain Wayne Blankenship,

> On May 1, 2002, Hawaiian entered into a Memorandum of Understanding ("MOU") with the [Airline Pilot's Association ("ALPA")] extending the ASAP program to Hawaiian's operations. . . .  The MOU establishes an Aviation Safety Action Partnership Event Review Committee ("ERC") to review confidential reports submitted through the ASAP program.  The ERC is composed of three members: one member from FAA; one member from ALPA; and one member from Hawaiian.  The purpose of the ASAP Program is to encourage pilots to report issues pertaining to the safe operation of flights.

Blankenship Decl. ¶ 3, n.1; *see* Def's. Ex. E.

4

17 to 21 times Plaintiff's experience in a 767; Plaintiff had logged 16 hours on the 767 with three landings, while Tilley had logged between 280 and 340 hours. O'Handley Decl. ¶¶ 6, 7; Tilley Decl. ¶ 5.

Plaintiff alleges that Tilley obstructed her control of the aircraft during the Las Vegas landing. Pl's. Decl. ¶ 4. Plaintiff verbally reprimanded Tilley for his insubordination, telling him to get his "fucking hands off the controls." Pl's. Dep. Tr. attached as Def's Ex. F at 251; Pl's. Decl. ¶ 4. Plaintiff claims that Tilley responded by threatening that it would "be the end" of her if she spoke in that manner to him again. Pl's. Decl. ¶ 4. Plaintiff admits that Tilley never touched her during the April 27 and 28, 2003 flights; did not otherwise harass her before or after these flights; and that Tilley treated Plaintiff just as he had treated Captain Darrell Chun, a male. Pl's. Dep. Tr. attached as Def's. Ex. F at 193, 195-97. Plaintiff reported Tilley's conduct to Hawaiian.

Following the flight, Tilley contacted Chief Pilot Mike Dudley ("Dudley") to discuss his concerns regarding Plaintiff's handling of the landing in Las Vegas. Tilley Decl. ¶ 7. Tilley also reported his concerns regarding Plaintiff's ability to land a 767 to the ERC and Hawaiian. *Id.* at ¶ 9.

Dudley also spoke with Plaintiff who told him that Tilley had assumed control of the yoke without her permission and that she did not want

Tilley as her second-in-command on the return flight.  Dudley Decl. ¶ 2.

According to Dudley, Plaintiff did not mention that she was harassed or

discriminated against by Tilley.  *Id.*  According to Plaintiff, however, she told

Dudley that Tilley called flight attendants "bitches," threatened her, and tried to

sabotage her flying.  Pl's. Dep. Tr. attached as Def's. Ex. F at 208-09.  Plaintiff

claims that Dudley "assured me that it would be handled in-house and not to file

an incident report, again that it would be handled in-house, they would take care

of it, they'd get him off my flight, not to get the FAA involved. . . ."  *Id.* at 209.

Dudley removed Tilley from the cockpit on Plaintiff's return flight.

*See* Pl's. Dep. Tr. attached as Def's. Ex. F at 323; Dudley Decl. ¶¶ 3-4; Tilley

Decl. ¶ 8.  Following the April 28, 2003 flight, Tilley never again flew as

Plaintiff's second-in-command.  Tilley Decl. ¶ 16.

### 2.   *May 12, 2003 Flight With Tom Hada*

First Officer Tom Hada ("Hada") also filed a report regarding his

concerns about Plaintiff's ability to land a 767.  Hada was Plaintiff's second-in-

command on a May 12, 2003 round-trip flight between Honolulu and Los

Angeles.  Steve Dahlin ("Dahlin"), an inspector from the FAA, rode in the

cockpit's jump seat.  Hada Decl. ¶ 2.  By May 12, 2003, Plaintiff had 45 hours and

35 minutes of flight time as a pilot-in-command of a 767, while Hada had over

258 hours logged.  O'Handley Decl. ¶¶ 8, 9.  Hada explains that "[o]n approach to Los Angeles, [Plaintiff] was unable to execute a landing on her first approach, so she turned around and landed on a second approach."  Hada Decl. ¶ 6.  Following the flights, Hada filed a report with the ERC and Hawaiian regarding his concerns over Plaintiff's ability to land the 767.  *See* Hada Decl. ¶ 7.

### 3.    *May 28, 2003 Flight With Larry Payne*

First Officer Larry Payne ("Payne") served as Plaintiff's second-in-command on a May 28, 2003 flight from Honolulu to Sacramento.  By this point, Plaintiff had 67 hours of flight time as a pilot-in-command of a 767 and had landed 14 times; in comparison, Payne had logged over 350 hours in the 767.  *See* Pl's. Dep. Tr. attached as Def's. Ex. A at 94-95; O'Handley Decl. ¶¶ 10, 11; Payne Decl. ¶ 5.  Like Tilley and Hada, Payne filed a report with the ERC and Hawaiian voicing his concerns regarding Plaintiff's ability to land the 767.  Payne Decl. ¶ 6.

According to Plaintiff, Payne repeatedly talked about sex, including speculating on Plaintiff's sex life with her husband and her difficulty in conceiving, continuing even after Plaintiff instructed him to stop.  Pl's. Dep. Tr. attached as Def's. Ex. F at 264-65, 269; Pl's. Decl. ¶ 7.  Payne also referred to Plaintiff as "honey" over her objections and gave Plaintiff an unsolicited hug later in the day.  Pl's. Dep. Tr. attached as Def's. Ex. F at 263; Pl's. Decl. ¶¶ 8-9.

Plaintiff admits that she was not harassed by Payne before or after their May 28, 2003 flight.  *See* Pl's. Dep. Tr. attached as Def's. Ex. F at 255.  Plaintiff reported Payne's conduct to Hawaiian and filed an ASAP report claiming insubordination and sexual harassment.  Def's. Ex. I at 2.  Payne did not ever again fly as Plaintiff's second-in-command.  Payne Decl. ¶ 12.  Payne was furloughed effective September 30, 2003 and removed from Hawaiian's flight schedule.  Blankenship Decl. ¶ 12; Payne Decl. ¶ 11; Def's Ex. O.

**4.     *Hawaiian Issues Line Checks In Response to Reports Filed by First Officers Tilley, Hada, and Payne***

Fleet Captain Wayne Blankenship ("Blankenship") issued a line check[4] to Plaintiff on June 3, 2003.  As he explains,

> [b]ased on the submission and content of the three ASAP reports by three experienced first officers within two months of her first flight on a 767 coupled with her lack of experience on the 767, I was concerned about Ms. Finazzo's performance in command of the 767.  After consulting with Chief Pilot Michael Dudley, I concluded that Finazzo's performance should be evaluated by a check airman.

Blankenship Decl. ¶ 9.  At the time that he issued the line check, Blankenship was not aware of Plaintiff's claims regarding Tilley and Payne's alleged behavior, nor was he aware that Plaintiff had asked Dudley to remove Tilley from a flight.

---

[4] During a line check, a "check airman" flies with a pilot to evaluate that pilot's performance.  Blankenship Decl. ¶ 5.

Blankenship Decl. ¶ 10.  Plaintiff admits that she has no evidence that Blankenship was aware that she had filed reports of harassment.  Pl's. Dep. Tr. attached as Def's. Ex. F at 324.

When conducting the June 20, 2003 line check ordered by Blankenship, Check Airman Scott Banning ("Banning") became concerned about Plaintiff's ability to effectively communicate her landing preferences to her first officers.  Banning Decl. ¶ 2-9; Def's. Ex. P.  Banning therefore scheduled Plaintiff for a follow-up line check on October 4, 2003.  Banning Decl. ¶ 11.  Plaintiff had the option to refuse further proficiency checks from Banning, but did not do so. *See* Pl's. Dep. Tr. attached as Def's. Ex. F at 181, 329.  Plaintiff claims that Banning did not tell her of the follow-up line check and that she first learned of it after hand-delivering a letter complaining of threats, discrimination, and harassment to Captain Bill Seavey.  Pl's. Dep. Tr. attached as Def's. Ex. F at 222.

At the time Banning conducted the line check and ordered the follow-up line check, he was not aware that Plaintiff had complained about discrimination or harassment.  Banning Decl. ¶ 12.  Plaintiff admits that Banning did not retaliate against her.  *See* Pl's. Dep. Tr. attached as Def's. Ex. F at 321.[5]

---

[5] Plaintiff claims that Banning told her that he was forced to give her the line check and that she was getting line checked because she was female.  Pl's. Dep. Tr. Attached as Def's. Ex.

(continued...)

From June 3, 2003 through October 4, 2003, Plaintiff retained the rank of captain, continued to receive the same pay and benefits, and continued to fly according to her selections.  Blankenship Decl. ¶ 14.  Check Airman Dave Wolz ("Wolz") conducted Plaintiff's October 4, 2003 line check.  Pl's. Dep. Tr. attached as Ex. F at 329.  Plaintiff was aware that she had the option to refuse further proficiency checks from Wolz, but did not do so.  Pl's. Dep. Tr. attached as Ex. F at 329.  Plaintiff admits that Wolz did not retaliate against her.  *See* Pl's. Dep. Tr. attached as Ex. F at 329.

Plaintiff claims to have suffered "occupational anxiety" as a result of the June and October 2003 line checks.  However, Plaintiff did not receive a deduction in pay or benefits, and was not demoted or suspended as a result of these line checks.  *See* Pl's. Dep. Tr. attached as Ex. F at 330-31.

Plaintiff was not the only person to receive line checks: Tilley received three.  The first occurred on June 17, 2003 and the second on October 9, 2003.  Blankenship Decl. ¶ 12.  A third line check of Tilley occurred when he accompanied a captain who was line checked.  Tilley Decl. ¶ 14.  Because Payne

---

[5](...continued)
F at 201-02; Def's. Ex. I at 1.  Plaintiff does not provide any further evidence regarding this conversation, and it is unclear if Banning was repeating what was told to him by another or if he was merely speculating.  To the extent he was repeating what another told him, the statement is inadmissible hearsay.  Otherwise, the statement appears to be speculation.

was furloughed, he was not line checked.

### 5.      The "CRM" Incident: Plaintiff Is Required to Undergo Remedial Crew Resource Management Training on April 19, 2004

On October 7, 2003, the ERC ordered Plaintiff, Tilley, Hada, and Payne to receive additional training.  In a letter dated October 7, 2003, the ERC explained that it had instructed Hawaiian to require *all* pilots involved in ASAP events to undergo remedial Crew Resource Management ("CRM") training.[6] Blankenship Decl. ¶ 16; Def's Ex. J.  Tilley, Hada, and Payne all received the same letter as Plaintiff.  Hada Decl. ¶ 8; Payne Decl. ¶ 7; Tilley Decl. ¶ 10.  On March 22, 2004, Plaintiff received a letter from Hawaiian notifying her that the ERC-mandated training was scheduled for April 19, 2004.  The training itself was designed by Dave Kolakowski ("Kolakowski"), the Senior Director of Hawaiian's Flight Standards and Training Department, with input from an ERC member.  *See* Pl's. Dep. Tr. attached as Ex. F at 361; Kolakowski Decl. ¶ 6; Def's. Ex. M.

Kolakowski decided to separate Plaintiff from Tilley, Hada, and Payne during the ERC-mandated CRM training.  Since Plaintiff was a captain,

_____

[6]  In her pleadings, Plaintiff claims that it was Hawaiian, and not the ERC, that required Plaintiff to undergo additional training.  However, in her Declaration, Plaintiff admits that the ERC mandated the remedial CRM training.  Pl's. Decl. ¶ 11.  Further, the October 7, 2003 letter states that the "ERC directs that all of the pilots involved in these events undergo a special remedial CRM training session. . . ."  There is no evidence to support Plaintiff's claim that Hawaiian, and not the ERC, ordered the CRM training.

Kolakowski felt that the emphasis of her training should be different from that of the first officers.  Kolakowski Decl. ¶ 8.  Kolakowski also feared that Plaintiff would not be able to concentrate on her training while in the presence of two men she was accusing of harassment.  Kolakowski Decl. ¶ 8.  Plaintiff admitted that she wanted to be separated from Tilley and Payne.  Pl's. Dep. Tr. attached as Def's. Ex. F at 207, 269.  Plaintiff did not file an EEOC charge against Kolakowski.  Pl's. Dep. Tr. attached as Ex. F at 179.

Tom Storhaug ("Storhaug") conducted Plaintiff's remedial CRM training on April 19, 2004.  Plaintiff's CRM training was based on a standard CRM class outline and emphasized Plaintiff's role as a captain in the cockpit.[7] Plaintiff was neither demoted, suspended, nor had her pay docked as a result of her participation in the CRM training.  Kolakowski Decl. ¶ 13.  Further, it was Kolakowski's understanding that Plaintiff was allowed to have First Officer Zoe Ann Roach attend the CRM training with her on that date.  Kolakowski Decl. ¶ 9.  During the training, Plaintiff claims that male instructors questioned her about her marital status and behaved in a generally hostile manner towards her.  *See* Pl's. Decl. ¶ 14.

---

[7] Tilley, Hada, and Payne attended their remedial CRM training session on April 20, 2004.  Storhaug used the same CRM class outline to conduct the training for Tilley, Hada, and Payne, but instead emphasized the role of a first officer in the cockpit.

Following the remedial CRM training, Plaintiff alleges that she felt "very fatigued" and took a voluntary leave of absence by calling in sick for two months.  During that time, Plaintiff did not file a workers compensation claim and thus did not receive pay.  Pl's. Dep. Tr. attached as Def's. Ex. U at 488, 490-91.

6.   *The "LOFT" Incident: Plaintiff Makes a Mistake During Her August 28, 2004 Line Oriented Flight Training and Quits*

On April 17, 2004 -- two days prior to the start of her CRM training -- Plaintiff submitted a bid to fly 717s.  Pl's. Dep. Tr. attached as Ex. A at 95-96.  As part of her transition training, Plaintiff attended a Line Oriented Flight Training Program ("LOFT") on August 28, 2004.  Check Airman Craig Kahauolopua ("Kahauolopua") administered the training and documented the session.  Pl's. Dep. Tr. attached as Ex. F at 174-75; Kahauolopua Decl. ¶¶ 2-3; Def's. Ex. R.  Plaintiff was accompanied by First Officer Keith Kamemoto ("Kamemoto").

According to Kahauolopua, Plaintiff performed a maneuver incorrectly.  When this happened, Plaintiff apparently blamed Kahauolopua, Kamemoto, and the flight simulator; quit her training; and left.  Kahauolopua Decl. ¶¶ 6-9.  Plaintiff claims that she was not allotted the correct amount of time in which to complete the training.  *See* Pl's. Dep. Tr. attached as Ex. F at 175, 177.

At the time he conducted the training, Kahauolopua was not aware of

Plaintiff's harassment and discrimination complaints or that she had filed an

EEOC charge in October 2003.  *See* Kahauolopua Decl. ¶ 10.  Plaintiff admits that

Kahauolopua did not retaliate against her and that she did not file an EEOC charge

regarding her failed August 2004 LOFT training.  *See* Pl's. Dep. Tr. attached as

Ex. F at 176-78.  Plaintiff successfully completed the LOFT training on September

5, 2004.  *Id.*

> **7.     *The "LOE" Incident: Plaintiff Fails a May 7, 2005 Line Oriented Evaluation***

Plaintiff took a flight simulator test from May 5 to 7, 2005.  She

attended this training, held in California, with First Officer Peter Fata ("Fata").

Check Airman Peter Anderson ("Anderson"), administered, monitored, and

documented the test.  Pl's. Dep. Tr. attached as Def's. Ex. A at 113-14; Fata Decl.

¶ 4; Def's. Exs. K at 152 & S.  At the time he administered the training, Anderson

did not know that Plaintiff had made reports of discrimination and harassment.

Anderson Decl. ¶ 10.

On the third day of training, Plaintiff and Fata underwent a Line

Oriented Evaluation ("LOE").  When Plaintiff and Fata did not perform an

instrument approach properly, Anderson asked them to repeat the maneuver.

Anderson Decl. ¶ 6; Fata Decl. ¶ 6; Def's. Ex. K at 155.  Plaintiff refused, saying

that she would not continue her training unless there was an ALPA representative present.  *See* Fata Decl. ¶ 7; Pl's. Decl. ¶ 15.  Anderson gave Plaintiff and Fata failing grades for the instrument approach; gave Plaintiff an "incomplete" grade for the test; and began making arrangements for an ALPA representative to be present.  *See* Pl's. Dep. Tr. attached as Def's. Ex. A at 117-18; Anderson Decl. ¶¶ 6-8; Fata Decl. ¶ 8; Def's. Ex. S.  Plaintiff admits that she is not aware of a male captain who has passed an LOE despite failing an instrument maneuver or of a male captain who has been permitted to have an ALPA representative present during a flight simulation test already in progress.  *See* Pl's. Dep. Tr. attached as Ex. F at 184, 187.  On May 8, 2005, Fata continued his flight simulator training and, when paired with a different captain, was able to perform the instrument approach maneuver successfully.  Fata Decl. ¶ 9.

Plaintiff claims that Anderson acted improperly towards her, including discussing the prescription drug Viagara.  Plaintiff knew she had the option of refusing to receive further training or proficiency checks from Anderson, but did not do so.  *See* Pl's. Dep. Tr. attached as Ex. F at 181.  Plaintiff did not file an EEOC charge regarding the May 7, 2005 LOE training.  Pl's. Dep. Tr. attached as Def's. Ex. K at 145-46.

On May 16, 2005, Plaintiff performed the LOE again, this time

accompanied by an ALPA representative.  Plaintiff successfully passed this LOE

test.  Pl's. Dep. Tr. attached as Def's. Ex. F at 168.

### 8.   *The Glasgow Letter: Plaintiff Is Warned That Failing Her Training and Insubordination May Lead to Her Termination*

Plaintiff continued to maintain the rank of captain, received the same

pay and benefits, and continued to fly.  Pl's. Dep. Tr. attached as Ex. F at 183-84.

Plaintiff was not demoted or suspended, and did not receive decreased pay as a

result of the ASAP investigations.  Pl's. Dep. Tr. attached as Def's. Ex. F at 354-

55.

On May 17, 2005, however, Robert Glasgow ("Glasgow"), the Vice

President of Hawaiian's Flight Operations, sent Plaintiff a letter stating that her

refusal to complete the simulator test without an ALPA representative present was

unacceptable insubordination which could merit discharge.  Glasgow Decl. ¶ 2;

Def's. Ex. T; Pl's. Decl. ¶ 16.  At the time he wrote the letter, Glasgow was

unaware of Plaintiff's claims of gender discrimination and harassment.  Glasgow

Decl. ¶ 3.  Plaintiff did not file an EEOC claim against Glasgow.  Pl's. Dep. Tr.

attached as Ex. K at 146-47.

### 9.   *Plaintiff's Complaints to Hawaiian About Workplace Incidents*

On June 26, 2003, Plaintiff wrote a letter to Dudley complaining that

16

she had been physically threatened by Tilley and sexually harassed by Payne

during her April 27 and 28, 2003 and May 28, 2003 flights.  *See* Dudley Decl. ¶ 5;

Pl's. Decl. ¶ 10; Def's. Ex. H.  The letter did not mention that Plaintiff believed

that Tilley harassed or discriminated against her on account of her gender.  Dudley

Decl. ¶ 5; Def's. Ex. H.  Instead, Plaintiff wrote

> [a]s a woman threatened by this man, I go to work in fear that
> F/O Tilley will seek me out, and act on his threat.
>         What is Hawaiian Airlines doing to insure my personal
> safety from this threat while I am at work?
>         I see F/O Tilley on the active flight roster and live in fear
> that he will confront me either in an isolated hallway or worse,
> in a dark employee parking lot.

Def's. Ex. H at 2.  According to Dudley, this letter was the first notice he received

that Plaintiff believed that Payne sexually harassed her.  Dudley ¶ 5.  Plaintiff also

wrote that First Officer "Payne's reference to me as **'<u>HONEY</u>'** was, insulting

degrading as an individual, unsolicited and unwelcome and intending to make me

feel uncomfortable as a woman pilot, the essence of Sexual Harassment."  Def's.

Ex. H at 3 (errors and emphasis in original).  Plaintiff did not mention Payne's

alleged references to her sex life with her husband.

        Following Dudley's receipt of Plaintiff's letter, Hawaiian began an

investigation into Plaintiff's allegations.  Plaintiff and two ALPA representatives

met with Janette Freeman ("Freeman"), Hawaiian's Manager of Legal Affairs, on

17

July 8, 2003 to discuss her allegations and concerns.  Following that meeting, and at Plaintiff's request, Freeman placed a notation in Plaintiff's file that she was not to be scheduled to fly with either Tilley or Payne.  In a letter to Plaintiff dated July 18, 2003, Freeman "concluded that neither F/O Tilley nor F/O Payne engaged in conduct that violates the Discrimination and Harassment-Free Workplace policy or House Rules."  Def's. Ex. Z.[8]  Freeman's opinion was based in part on the fact that "the alleged statements by F/O Tilley and F/O Payne, even by your own account, were both isolated incidents that occurred under the stress of other incidents in the cockpit (for which ASAP reports were filed . . . )."  *Id.*

In September 2003, Plaintiff wrote a second letter, this one to Bill Seavey ("Seavey") who replaced Dudley as Chief Pilot, regarding the April 27 and 28, 2003 and May 28, 2003 incidents.  *See* Pl's. Dep. Tr. attached as Def's. Ex. F at 221; Def's. Ex. I.  In this letter, Plaintiff refers to Tilley's actions as sexual harassment (rather than only as physical threats), and complains of discrimination

---

[8]  From 2003 to 2005, the time period covered by Plaintiff's Second Amended Complaint, Hawaiian had in effect a "Discrimination and Harassment-Free Workplace Policy" ("Policy") which prohibited gender-based discrimination and harassment.  *See* Def's. Ex. B.  The Policy also included a complaint procedure which employees could use to report discrimination, harassment, and retaliation.  Def's. Ex. B.  Hawaiian also had certain "House Rules" making discrimination and harassment dischargeable offenses.  Def's. Ex. C.

and a hostile work environment.[9]

### 10.    *Plaintiff's October 2003 and July 2004 EEOC Complaints*

On October 10, 2003, Plaintiff filed an EEOC charge claiming that

she was sexually harassed and discriminated against by Tilley and Payne and that

she was discriminated against when required to perform two line checks in 2003.

Def's Ex. L; Pl's. Ex. 2.  After checking both the box for gender discrimination

and retaliation, Plaintiff wrote,

> after I complained about discrimination, I do not believe
> Respondent took appropriate, corrective action against Tilly
> [sic] and Payne.  Instead, my ability to perform my Pilot duties
> have been called into question.  In late June 2003 and early
> October 2003, I was required to undergo two performance
> evaluations [sic] Line Checks.  Usually, I am only scheduled
> once a year for a Line Check.  I do not believe Tilly [sic] and
> Payne were subjected to the same scrutiny.
>      I believe that I have been discriminated against because
> of my sex, female.  Also, I believe that I have been retaliated
> against for complaining of discrimination.

*Id.*  On July 13, 2004, Plaintiff filed a second EEOC charge alleging gender

---

[9]  In this letter, Plaintiff claims that she spoke with Captain John Wade ("Wade") of "our professional standards committee."  According to Plaintiff, Wade stated that Tilley "had an ego problem and most likely did not like the fact that a woman was his Boss, and was probably jealous" and that Tilley "was known as a woman-hater."  Def's Ex. I at 1.  Plaintiff has not laid proper foundation to establish that Wade was speaking as an agent of Hawaiian, making his statement admissible under Federal Rule of Evidence 801(d)(2)(D).  There is no evidence that Wade is a captain at Hawaiian, that he served on Hawaiian's professional standards committee, or even that Hawaiian has its own professional standards committee.  Instead, it appears that ALPA -- of which Plaintiff is a member -- has a professional standards committee.  Absent a proper foundation, Wade's statement is inadmissible hearsay.

discrimination and retaliation during her April 19, 2004 CRM training.[10]   Def's.

Ex. K; Pl's. Ex. 3.  Plaintiff did not file EEOC charges regarding the May 7, 2005

LOE test; the August 28, 2004 LOFT training; or against Anderson, Glasgow,

Kahauolopua, Kolakowski, or the training department.  *See* Pl's. Dep. Tr. attached

as Def's. Exs. F at 176-79, K at 145-47, 179.

**B.     Procedural Background**

        Plaintiff filed her Complaint on August 15, 2005, and her First

Amended Complaint on December 2, 2005.  On April 27, 2006, Plaintiff filed a

Motion for Leave to File a Second Amended Complaint.  Magistrate Judge Leslie

E. Kobayashi granted Plaintiff's motion in part and permitted Plaintiff to add

claims for the intentional infliction of emotional distress and violations of HRS

§ 378-2.  Plaintiff subsequently filed her Second Amended Complaint on June 6,

2006.

        Hawaiian filed a Motion to Compel an independent psychiatric

evaluation of Plaintiff, which Magistrate Judge Kobayashi granted on July 26,

---

[10]   Plaintiff also filed an EEOC charge in June 2006 regarding a May 25, 2006 incident in which an anonymous person spelled out a graphic sexual message in magnetic letters on the refrigerator in the Pilot's Lounge at Honolulu International Airport.  Pl's. Decl. ¶ 20; Pl's. Ex. 7. Plaintiff filed a Motion for Leave to File a Third Amended Complaint on February 28, 2007, requesting permission to include this incident and the resulting EEOC charge in the present suit. Her motion was denied.  Thus, although Plaintiff discusses this issue in her Memoranda in Opposition, this claim is outside of the scope of the matter presently before this court.

2006.  Hawaiian also moved for leave to use and disclose Plaintiff's confidential health information.  Plaintiff filed her Opposition almost two weeks late.  On August 9, 2006, Magistrate Judge Kobayashi sanctioned Plaintiff by ordering her to pay Hawaiian's reasonable expenses, including attorney's fees and costs.  Magistrate Judge Kobayashi granted Hawaiian's Motion to Use and Disclose Plaintiff's Confidential Health Information on September 8, 2006.

On March 2, 2007, Hawaiian filed a Motion to Compel Discovery regarding Plaintiff's failure to appear at her previously scheduled and noticed depositions.  Plaintiff filed her Opposition on March 23, 2007 and Hawaiian filed its Reply on March 26, 2007.  On March 28, 2007, Magistrate Judge Kobayashi ordered Plaintiff to appear at a deposition -- concerning the issue of damages -- on April 10, 2007 at 9:00 a.m.  Magistrate Judge Kobayashi's Order explained that Plaintiff's failure to appear at her deposition could result in the imposition of sanctions including, but not limited to, the dismissal of her case and the charging of attorney's fees and costs.

Hawaiian filed two Motions for Partial Summary Judgment on January 24, 2007.  Plaintiff requested a Rule 56(f) continuance.  This court granted Plaintiff a continuance to conduct additional discovery, deemed Hawaiian's motions for summary judgment withdrawn, and vacated the trial dates.

On April 4, 2007, Plaintiff filed a Motion for a Protective Order
seeking to stay her court-ordered April 10, 2007 deposition.  Hawaiian opposed
Plaintiff's Motion.  Magistrate Judge Kobayashi denied Plaintiff's Motion for a
Protective Order on April 9, 2007 and again ordered Plaintiff to appear at her
deposition, scheduled to take place the next day.  Following Plaintiff's appeal, this
court affirmed Magistrate Judge Kobayashi's Order Denying Plaintiff's Motion for
a Protective Order.

In contravention of Magistrate Judge Kobayashi's March 28, 2007
and April 9, 2007 Orders, Plaintiff failed to appear at her April 10, 2007
deposition.  On April 27, 2007, Hawaiian filed a Motion for Rule 37 Sanctions
Against Plaintiff and Plaintiff's Counsel.  Plaintiff filed a Memorandum in
Opposition and a Cross Motion for a Continuance on May 18, 2007.  Hawaiian
filed its Reply on May 25, 2007.  On June 6, 2007, Magistrate Judge Kobayashi
filed a Findings and Recommendations granting in part and denying in part
Hawaiian's Motion for Sanctions and denying Plaintiff's Motion for an Additional
Continuance.  Magistrate Judge Kobayashi recommended that this court deny
Hawaiian's request for dismissal of the entire case, but grant Hawaiian's alternate
request for lesser sanctions by dismissing Plaintiff's claims for intentional
infliction of emotional distress and general damages claims; that this court award

Hawaiian its reasonably incurred attorneys' fees and costs associated with the Motion for Sanctions and the scheduled deposition; that this court deny Hawaiian's Motion for Sanctions in all other respects; and that this court deny Plaintiff's Motion for a Continuance.  Plaintiff did not file an objection to Magistrate Judge Kobayashi's June 6, 2007 Findings and Recommendations, and this court adopted it on June 27, 2007.

Hawaiian filed the present Motion for Partial Summary Judgment as to Count I (Title VII) and Count II (HRS § 378-2) and Motion for Partial Summary Judgment as to Count III (Intentional Infliction of Emotional Distress) and Punitive Damages Claim on June 8, 2007.  Plaintiff filed Memoranda in Opposition on June 29, 2007.  Hawaiian filed its Replies on July 6, 2007.  The court heard oral arguments on July 17, 2007.

### III.  <u>STANDARD OF REVIEW</u>

A party is entitled to summary judgment where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually

unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986).  Thus, summary judgment will be mandated if the non-moving party "'fails

to make a showing sufficient to establish the existence of an element essential to

that party's case.'"  *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258

(9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.  ANALYSIS

Plaintiff alleges that she was discriminated against during her April

27 and 28, 2003 flights with First Officer Tilley; during her May 28, 2003 flight

with First Officer Payne; during the April 19, 2004 CRM training; during the

August 28, 2004 LOFT training with Kahauolopua; and during the May 7, 2005

LOE test with Anderson.  Plaintiff also alleges that she was sexually harassed

during her April 27 and 28, 2003 flights with First Officer Tilley; during her May

28, 2003 flight with First Officer Payne; during the April 19, 2004 CRM training

with Storhaug; and during the May 7, 2005 LOE test with Anderson.  Finally,

Plaintiff alleges that she was retaliated against during the June 20, 2003 line check

administered by Banning; the October 3, 2003 line check administered by Wolz;

the April 19, 2004 CRM training; the August 28, 2004 LOFT training; the May 7,

2005 LOE test; and Glasgow's May 17, 2005 letter.  In response, Hawaiian argues

that certain claims should be dismissed because Plaintiff failed to exhaust her

administrative remedies or her claims are time-barred; that Plaintiff has failed to

offer sufficient evidence of discrimination, harassment, or retaliation; that

Plaintiff's claim for intentional infliction of emotional distress was properly

dismissed as a Rule 37 sanction; and that Plaintiff has not offered evidence

sufficient to sustain a claim for punitive damages.

A.     **Hawaiian Is Entitled to Summary Judgment Because Plaintiff Failed to Exhaust Her Administrative Remedies as to Certain Title VII Claims**

"In order to litigate a Title VII claim in federal district court,

[Plaintiff] must have exhausted her administrative remedies, including regulatory

and judicially imposed exhaustion requirements." *Greenlaw v. Garrett*, 59 F.3d

994, 997 (9th Cir. 1995) (internal citations omitted); *see also Vasquez v. County of

L.A.*, 349 F.3d 634, 644 (9th Cir. 2003); *B.K.B. v. Maui Police Dep't*, 276 F.3d

1091, 1099 (9th Cir. 2002); *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990).

"The jurisdictional scope of a Title VII claimant's court action

depends upon the scope of both the EEOC charge and the EEOC investigation."

*Sosa*, 920 F.2d at 1456.  Jurisdiction will extend to all claims which either "fell

within the scope of the EEOC's actual investigation or an 'EEOC investigation

which can reasonably be expected to grow out of the charge of discrimination.'"

*EEOC v. Farmer Bros.*, 31 F.3d 891, 899 (9th Cir. 1994) (internal quotation

marks, citation and emphasis omitted); *see also Vasquez*, 349 F.3d at 644; *B.K.B.*, 276 F.3d at 1099.  A district court must construe the language of an EEOC charge "'with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.'"  *B.K.B.*, 276 F.3d at 1100 (citation omitted); *see also Kaplan v. Int'l Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1359 (9th Cir. 1975).  However, if "two claims are not so closely related that a second administrative investigation would be redundant, the EEOC must be allowed to investigate the dispute before the employee may bring a Title VII suit." *Stache v. Int'l Union of Bricklayers & Allied Craftsmen*, 852 F.2d 1231, 1234 (9th Cir. 1988).

Plaintiff filed two EEOC Complaints.  In her October 10, 2003 Complaint, Plaintiff alleged that she was sexually harassed and discriminated against by Tilley and Payne and that she was discriminated against when required to perform two line checks in 2003.  Pl's. Ex. 2; Def's Ex. L.  Plaintiff's July 13, 2004 EEOC Complaint alleges that she was sexually harassed, discriminated against, and retaliated against during the April 2004 CRM training.  Pl's. Ex. 3.  Plaintiff admits that she did not file express EEOC claims regarding the August 28, 2004 LOFT training or the May 7, 2005 LOE test, nor did she file express EEOC charges against Anderson, Glasgow, Kahauolopua, Kolakowski, or the training department.  Pl's.

Dep. Tr. attached as Def's. Exs. F at 176-79, K at 145-47.

Even construing Plaintiff's EEOC charges with the utmost liberality, the court finds that Plaintiff's claims regarding the August 2004 LOFT training, the May 2005 LOE test, and Glasgow's May 2005 letter do not reasonably fall within the scope of the EEOC's investigation into Plaintiff's October 2003 and July 2004 EEOC claims.[11]   These incidents occurred in California, involved different personnel, and were discrete acts unrelated to the matters set forth in the EEOC charges.   There is no reason to think that EEOC investigations of the in-flight behavior of two first officers, the two line checks, and the CRM training would extend to other forms of tests and training issued by individuals entirely removed from the original incidents.   Because Plaintiff failed to exhaust her administrative remedies prior to filing suit, Hawaiian is entitled to summary judgment as to claims relating to the August 2004 LOFT training, the May 2005 LOE test, and the May

---

[11] As to the LOFT training, LOE test, and Glasgow letter, Plaintiff also failed to exhaust her administrative remedies by filing a charge with the Hawaii Civil Rights Commission ("HCRC") and receive a right-to-sue letter prior to alleging violations of HRS § 378-2 in federal court.   *See French v. Haw. Pizza Hut, Inc.*, 105 Haw. 462, 477, 99 P.3d 1046, 1061 (2004), *recon. denied*, 106 Haw. 42, 101 P.3d 651 (2004) (finding that plaintiff was precluded from bringing a gender discrimination claim under HRS § 378-2 where she had failed to first exhaust her remedies by including the claim in her HCRC complaint); *Pele Defense Fund v. Puna Geothermal Venture*, 827 P.2d 1149, 1154 (Haw. Ct. App. 1992) ("[J]udicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process.").

2005 Glasgow letter.[12]

## B.   Hawaiian Is Entitled to Summary Judgment Because Plaintiff Has Failed to Make Out a Prima Facie Claim of Gender Discrimination Under Title VII or HRS § 378-2

Title VII prohibits Hawaiian from discriminating against Plaintiff "with respect to [her] compensation, terms, conditions, or privileges of employment" on account of her gender.  42 U.S.C. § 2000e-2(a)(1).  Claims of gender discrimination under Title VII and HRS § 378-2 are evaluated under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[13]  *See, e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

---

[12] Because Hawaii is a "deferral state," Plaintiff must file an EEOC complaint for discrete Title VII acts within 300 days of their occurrence.  *See Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1174 (9th Cir. 1999) (citations omitted).  Although not discussed in her Second Amended Complaint, during her deposition, Plaintiff also made general allegations of harassment and discrimination occurring on unspecified dates in 2002.  Pl's. Dep. Tr. attached as Def's. Ex. K at 126-27.  "Where a defendant raises a statute of limitations defense, a plaintiff's conclusory allegations that his claims are timely, unsupported by facts showing that the incidents occurred within the relevant limitations period, are insufficient to survive a motion for summary judgment."  *Kaulia v. County of Maui et al.*, 2007 WL 2156091, at *12 (D. Haw. July 20, 2007); *see also Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ("Hernandez asserts that several these incidents occurred in 'late 1998' or 1999.  However, he offers no support for these asserted dates other than his declaration.  Indeed, he offers no specific dates for any of the actions.  Hernandez's conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment.");  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (*quoting Celotex*, 477 U.S. at 322)).  Any Title VII claims for harassment and discrimination occurring "sometime in 2002" are thus barred.

[13] A plaintiff is not always required to establish her claim through the *McDonnell Douglas* burden-shifting framework.  Instead, "when responding to a summary judgment motion,
(continued...)

1064 (9th Cir. 2002) (Title VII and state law discrimination claims); *Hac v. Univ. of Haw.*, 102 Haw. 92, 101, 73 P.3d 46, 55 (2003) ("This court has adopted the *McDonnell Douglas* analysis in HRS § 378-2 discrimination cases.").  The analysis of Plaintiff's Title VII and HRS § 378-2 state law discrimination claims are "identical in all relevant respects."  *Villiarimo*, 281 F.3d at 1064.

Plaintiff must establish her prima facie case by offering sufficient proof that (1) she belongs to a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) Hawaiian treated Plaintiff differently than it did similarly situated male captains.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).  "A plaintiff's failure to offer evidence establishing a necessary element of [her] prima facie case will ordinarily be fatal to [her] claim."  *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002).

"The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the

---

[13](...continued)
the plaintiff is presented with a choice regarding how to establish his or her case.  [The plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the defendant]."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).  Here, the court applies the *McDonnell Douglas* framework because it was applied by the parties themselves and because Plaintiff has not offered direct or circumstantial evidence that a discriminatory or retaliatory reason more likely motivated Hawaiian.

level of a preponderance of the evidence." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997).  Even applying this low standard, the court nonetheless finds that Plaintiff has failed to set forth sufficient evidence as to the third and fourth elements.

### 1.   *Plaintiff Is a Member of a Protected Class and Was Capable of Performing Her Job Satisfactorily*

At the outset, the court notes that the first two elements have been met.  First, as a female, Plaintiff belongs to a protected class.  Second, there is no evidence that she was unable to fill the descriptions of her job in the most rudimentary and basic sense as many of her evaluations were ultimately ranked "satisfactory."

### 2.   *Plaintiff Has Not Demonstrated that She Suffered An Adverse Employment Action*

For the purposes of a Title VII discrimination claim, an adverse employment action is one which materially affects the compensation, terms, conditions, or privileges of Plaintiff's employment.  42 U.S.C. § 2000e-2(a)(1). Plaintiff has not set forth any evidence that Hawaiian took any action which affected the compensation, terms, conditions, or privileges of her employment. Indeed, throughout the time period relevant to Plaintiff's Second Amended Complaint, Plaintiff was not suspended, demoted, transferred, or terminated.

30

Requiring Plaintiff to undertake additional training -- whether in response to reports regarding Plaintiff's ability to safely land the 767 or because Plaintiff herself submitted a bid to fly a different aircraft -- are not adverse employment actions: Plaintiff was compensated for her time during the training; she retained the rank of captain; and her job duties and privileges did not change.  Plaintiff has therefore failed to set forth evidence of an adverse employment action and, as such, cannot make out a prima facie discrimination claim.

### 3.     *Plaintiff Has Not Shown that She Was Treated Differently Than Male Captains*

Plaintiff has not introduced evidence to show that she was treated differently than other male captains.[14]  Indeed, she has not submitted any evidence at all -- whether in the form of declarations or depositions -- regarding Hawaiian's treatment of other captains, whether male or female.  Moreover, by Plaintiff's own admissions, she has no knowledge of any incident where a male captain who improperly conducted an instrument approach would not also receive a failing grade.  Plaintiff further admits that Tilley was also insubordinate towards a male captain.

---

[14]  In her Declaration, Plaintiff asserts that Tilley, Payne, and Glasgow's behavior was discriminatory.  *See* Pl's. Decl. ¶¶ 5, 6, 12, 14 & 16.  Plaintiff's statements are conclusory and are not sufficient to withstand a motion for summary judgment.  *See Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) (as amended); *Akee v. Dow Chemical Co.*, 272 F. Supp. 2d 1112, 1124 (D. Haw. 2003).

Instead, Plaintiff attempts to argue that she was treated differently than other similarly situated male first officers, specifically Tilley and Payne. There are several flaws with Plaintiff's contention.  At the outset, captains are not similarly situated to first officers: Captains have supervisory and command responsibilities and are subject to more stringent standards than first officers. Further, the record demonstrates that Plaintiff was not actually treated differently than male first officers: Following the ASAP reports, the ERC required Plaintiff, Tilley, Hada, and Payne to receive remedial CRM training; Tilley himself received three line checks; and Fata was, like Plaintiff, required to retake the LOE training after they failed their initial flight simulator test.[15]

Plaintiff has failed to demonstrate that she was treated differently than similarly situated males.  Hawaiian is thus entitled to summary judgment.[16]

---

[15]  Plaintiff complains that Payne was not line checked and that this is evidence of disparate treatment.  *See* Pl's. Resp. in Opp'n to Def's. Mot. for Partial Summ. J. on Count I and Count II at 12.  However, Payne was furloughed following the ASAP reports and was therefore not eligible for line checks until his return to service.

[16]  Even if Plaintiff had established her prima facie case, thus "creat[ing] a presumption" that Hawaiian required Plaintiff to undergo additional training because Plaintiff is female, Hawaiian has rebutted this presumption by "produc[ing] admissible evidence showing that [it] undertook the challenged employment action for a 'legitimate, nondiscriminatory reason,'" namely concerns for passenger safety.  *Cornwell,* 439 F.3d at 1028 (*quoting McDonnell Douglas Corp.,* 411 U.S. at 802).  Because Hawaiian articulated a legitimate, non-discriminatory rationale for its actions, the burden shifts back to Plaintiff to show that Hawaiian's given reason is merely pretext for a discriminatory motive.  *Id.*  Plaintiff has not offered any evidence suggesting that the actions of Anderson, Blankenship, Banning, Glasgow, Kahauolopua, or Kolakowski were pretext

(continued...)

32

**C.     Hawaiian Is Entitled to Summary Judgment as to Plaintiff's Title VII and HRS § 378-2 Sexual Harassment and Hostile Environment Work Claims**

Plaintiff asserts a Title VII and HRS § 378-2 claim for a hostile work environment due to sexual harassment.  To sustain her Title VII claim, Plaintiff must show "(1) the existence of a hostile work environment to which the plaintiff was subjected, and (2) that the employer is liable for the harassment that caused the hostile environment to exist."  *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 786-89 (1998); *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001).  To establish a hostile work environment premised on sexual harassment, Plaintiff must show:  "(1) that [she] was subjected to verbal or physical conduct of a . . . sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment."  *Vasquez*, 349 F.3d at 642.  "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."  *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) (*citing King v. Bd. of Regents*, 898 F.2d 533, 537 (7th Cir. 1990)).

_____

[16](...continued)
for discrimination.

33

The third element requires consideration of the totality of the circumstances and whether the harassment was both objectively and subjectively abusive.  *Freitag*, 468 F.3d at 539.

In order to establish an HRS § 378-2 hostile work environment claim based on sexual harassment

> the claimant must show that: (1) he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct or visual forms of harassment of a sexual nature; (2) the conduct was unwelcome; (3) the conduct was severe or pervasive; (4) the conduct had the purpose or effect of either: (a) unreasonably interfering with the claimant's work performance, or (b) creating an intimidating, hostile, or offensive work environment; (5) the claimant actually perceived the conduct as having such purpose or effect; and (6) the claimant's perception was objectively reasonable to a person of the claimant's gender in the same position as the claimant.
>
> In addition, with regard to the third element of the claim, we observe that the required showing of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.  For example, a single severe act can be enough to establish a claim, and multiple incidents, each of which may not be severe when considered individually, can be enough to establish a claim when evaluated collectively.

*Arquero v. Hilton Hawaiian Village*, 104 Haw. 423, 428, 91 P.3d 505, 510 (2004) (*quoting Nelson v. Univ. of Haw.*, 97 Haw. 376, 390-91, 38 P.3d 95, 109-110 (2000)) (emphasis omitted).

Plaintiff has not proffered evidence of sexual harassment or a hostile

work environment sufficient to withstand Hawaiian's motion for partial summary judgment.  Accepting Plaintiff's allegations as true, all the court is left with are four isolated incidents: the flight with Tilley (where he obstructed her control of the 767 and told her that if she swore at him again it would be "the end" of her); the flight with Payne (where he referred to her as "honey," forced a landing against her orders, spoke about her marital relationship, and gave her an unsolicited hug); the remedial CRM training with Storhaug (where he questioned her about her marital status); and the LOE evaluation with Anderson (where he discussed the prescription drug Viagara).  Although some of the comments made are clearly distasteful, these incidents are not sufficiently severe or pervasive so as to constitute sexual harassment or a hostile work environment.  In assessing a claim of a hostile work environment, this court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  The incidents, occurring over a several-year period, were sporadic, not particularly severe, were not physically threatening and at most constitute offensive utterances.  In short, the conduct was not sufficiently egregious to

constitute sexual harassment or a hostile work environment.[17]

**D.    Hawaiian Is Entitled to Summary Judgment Because Plaintiff Has Failed to Make Out a Prima Facie Case of Retaliation Under Title VII and HRS § 378-2**

Under 42 U.S.C. § 2000e-3, it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. "  To sustain her retaliation claim under federal and state law, Plaintiff must show by preponderance of the evidence that (1) she was involved in a protected activity opposing an unlawful employment practice; (2) that Hawaiian took an adverse personnel action against her; and (3) there is a causal link between the protected activity and the adverse action.  *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004); *Vasquez v. County of L.A.*, 349 F.3d 636, 646 (9th Cir. 2003); *Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 426, 32 P.3d 52, 70 (2001).

---

[17]  Because the court finds that the conditions Plaintiff complains of did not constitute sexual harassment or a hostile work environment, the court does not reach Hawaiian's argument that it is entitled to summary judgment because it exercised reasonable care to prevent and correct the harassing behavior or because Plaintiff failed to take advantage of the available preventative and corrective measures.

Plaintiff's failure to offer evidence establishing one of these elements will be fatal

to her claim.  *See Lyons*, 307 F.3d at 1113.

McDonnell Douglas' burden shifting framework applies to retaliation

claims.  *See McGinest*, 360 F.3d at 1124.  Again, Plaintiff's burden of proof on

summary judgment as to her prima facie claim is very low.  Nonetheless, even

assuming the first two elements are satisfied, Plaintiff has failed to set forth

evidence sufficient to demonstrate causation.  *Cordova*, 124 F.3d at 1148.

Plaintiff must demonstrate "a causal link between the protected

activity and the adverse employment decision."  *Villiarimo v. Aloha Island Air,*

*Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002); *see also Schefke*, 96 Haw. at 426, 32

P.3d at 70 (requiring causal link for retaliation claims under state law).  To

establish causation, Plaintiff must show "by a preponderance of the evidence that

engaging in the protected activity was one of the reasons for [her] firing and that

but for such activity [she] would not have been fired."  *Id.* at 1065 (citations

omitted).  Thus, Plaintiff "must make some showing sufficient for a reasonable

trier of fact to infer that [Hawaiian] was aware that [Plaintiff] had engaged in

protected activity."  *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185,

1197 (9th Cir. 2003)*; see also Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th

Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that

37

the plaintiff had engaged in the protected activity.").

Plaintiff has failed to make the required showing because she has failed to counter Hawaiian's proffered evidence that the decision makers were not aware that she had made any complaints of gender discrimination or sexual harassment.  Anderson, Blankenship, Banning, Glasgow and Kahauolopua have all stated under oath that they were unaware of Plaintiff's protected activity at the time that they conducted their reviews.  Moreover, it was the ERC, and not Hawaiian, that mandated the remedial CRM training.

Plaintiff has therefore failed to demonstrate that the decision makers were aware of Plaintiff's activity when they conducted their evaluations.  As a result, they could not have retaliated against her for activity of which they were not aware.[18]  In sum, Plaintiff has failed to set forth evidence sufficient to demonstrate the causal link crucial to her retaliation claim.  Hawaiian is therefore entitled to summary judgment.[19]

---

[18]  Nor has Plaintiff demonstrated that Hawaiian's supervisors acted in response to information provided by a subordinate harboring a retaliatory animus.  *See Poland v. Chertoff*, 2007 U.S. App. Lexis 17247, at *19-20 (9th Cir. July 20, 2007) ("We hold that if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.").

[19]  If Plaintiff had been able to establish a prima facie retaliation case, the burden would
(continued...)

**E.     Plaintiff's Intentional Infliction of Emotional Distress Claims Were Dismissed as a Rule 37 Sanction**

Plaintiff's claim for Intentional Infliction of Emotional Distress was dismissed as a Rule 37 sanction for failing to appear multiple times for her deposition, even after the court had twice ordered Plaintiff to do so.  Plaintiff did not appeal Magistrate Judge Kobayashi's Rule 37 sanction and this court adopted it on June 27, 2007.

**F.     Hawaiian Is Entitled to Summary Judgment as to Plaintiff's Claim for Punitive Damages**

Given the court's findings above, the court also GRANTS Hawaiian summary judgment as to Plaintiff's claims for punitive damages.

## V.   CONCLUSION

The court finds that Hawaiian is entitled to summary judgment as to all claims contained in Plaintiff's Second Amended Complaint.  The court thus GRANTS Defendant's Motion for Partial Summary Judgment on Count I (Title VII) and Count II (HRS § 378-2) and GRANTS Defendant's Motion for Partial Summary Judgment on Count III (Intentional Infliction of Emotional Distress) and

---

[19](...continued)
shift to Hawaiian to articulate a legitimate, nondiscriminatory reason for requiring Plaintiff to undergo additional training.  Plaintiff would then bear the ultimate burden of demonstrating that this reason is pretextual.  *McGinest*, 360 F.3d at 1124.  As the court noted, Hawaiian has set forth a legitimate, non-retaliatory reason for its actions, namely the safety concerns of the passengers.  Plaintiff has not offered any evidence demonstrating that this rationale is pretextual.

Punitive Damages.  The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 7, 2007.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Finazzo v. Hawaiian Airlines*, Civ. No. 05-00524 JMS/LEK, Order Granting Defendant's Motions for Partial Summary Judgment